UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | |
|---|---|
| BILLY J. AND MARY ANN CUNNINGHAM, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | 1:04-cv-1616-JDT-TAB |
| MASTERWEAR, INC., a/k/a AMERICAN ) | |
| DRY CLEANING & LAUNDRY, INC., a/k/a ) | |
| AMERICAN GLOVE COMPANY, JAMES A.) | |
| REED, LINDA LOU MULL REED, WILLIAM ) | |
| J. CURE, and ELIZABETH J. CURE, ) | |
| ) | |
| Defendants. ) | |

**ENTRY DENYING MOTIONS FOR SUMMARY JUDGMENT (Docket Nos. 42, 49, 53)**[1]

Plaintiffs Billy J. and Mary Ann Cunningham bring this diversity action to recover

damages they allegedly incurred at the hands of Defendants Masterwear, Inc., a/k/a

American Dry Cleaning & Laundry, Inc., a/k/a American Glove Company; James A.

Reed, Linda Lou Mull Reed (collectively, "Masterwear"), William J. Cure and Elizabeth

J. Cure.  The Cunninghams contend that these Defendants exposed them to hazardous

chemicals in their business and home for years, which resulted in the Cunninghams

experiencing prolonged health problems.  Based in large part on this contention, the

Cunninghams assert claims for gross negligence, negligence, trespass, continuing

nuisance and negligent infliction of emotional distress against all of the Defendants.

---

[1]  This Entry is a matter of public record and will be made available on the court's web
site.  However, the discussion contained herein is not sufficiently novel to justify commercial
publication.

On August 9, 2005, Defendants William J. and Elizabeth J. Cure moved for

summary judgment pursuant to Federal Rule of Civil Procedure 56(b), seeking dismissal

of all of the claims against them.  The Cunninghams followed suit on September 19,

2005, filing a cross-motion for summary judgment.  Not to be outdone, Masterwear filed

a motion for summary judgment on October 20, 2005.  All three motions seek a court

determination of one issue—whether the Cunninghams' claims are barred by the

applicable statute of limitations.  The motions are all fully briefed and ripe for

determination, and the court now rules on them as follows.

I.      BACKGROUND

Defendant Masterwear was a commercial dry cleaner of industrial laundry owned

by Defendants James A. and Linda Lou Mull Reed and located in Martinsville, Indiana.

(Masterwear Mot. Summ. J. 2.)  This case arises from a well-known and well-

documented environmental contamination involving Masterwear that affected many

residents of Martinsville.  Among them were Billy J. and Mary Ann Cunningham, who

resided in the same or adjacent property as Masterwear for years.

From December 1985 to December 1991, Defendants William J. and Elizabeth J.

Cure, owners of a commercial building located at 28 North Main Street in Martinsville,

leased the second floor of that building to Masterwear.  (Billy J. Cunningham Dep.

10:16-20.)  During that time, Masterwear also was located in an adjacent building at 60-

80 West Washington Street.  (*Id.* 10:2-4.)  On or about April 1, 1986, the Cures

contracted to lease the first floor of 28 North Main to the Cunninghams to house their

photography business.  (*Id.* 9:13-21.)  The Cunninghams leased the space until 1994, when they purchased the 28 North Main property from the Cures for a contract price of $50,000.  (Cure Ex. F.)  The Cunninghams moved their personal residence into the second floor of the property in March 1994. (Comp. ¶ 15.)

On two occasions between 1986 and 1991, the Cunninghams smelled a "sweet" smelling chemical like that used by dry cleaners in the 28 North Main property.  (B. Cunningham Dep. 42:4-6, 44:7-10.)  Apparently the odor was so strong that it caused the Cunninghams' eyes and lungs to burn, so they temporarily vacated the property and reported the odor to the local fire department.  (*Id.* 41:14-17.)  The fire department came to the property and investigated the odor, but found nothing.  (*Id.* 45:14-18.)  This apparently led the Cunninghams to believe that there were no chemicals on the property.  (*Id.* 61:1-62:6.)  However, the Cunninghams reported the chemical odors to the Mayor and Chief of Police of Martinsville, as well as to the Indiana Department of Environmental Management twice.  (*Id.* 60:16-18.)  The result of those reports is unclear from the record.

The Cures contend that the Cunninghams not only smelled, but also observed, chemical spills by Masterwear.  This included "liquid [running] down the walls from Masterwear" (Cure Ex. B), although Mr. Cunningham explained that he thought that liquid could be rain water.  (B. Cunningham Dep. 74:14-17.)  Apparently Mr. Cunningham was aware that Masterwear used its building for its dry cleaning operation, and that chemicals were used in that operation.  (*Id.* 10:23-11:1.)  According to Mr. Cunningham, after Masterwear moved out of the property, Mr. Cure "had to haul huge

3

barrels of liquid chemicals and hazardous waste, tons of contaminated rags, and human waste out of the upper level storage area after Reed left."  (Cure Ex. B.)  Ms. Cunningham's knowledge about Masterwear's operation is less evident.

On or about November 1987, Mr. Cunningham began to experience health problems, including respiratory problems, sinus problems, a "hacking cough" that required frequent treatment and caused a hernia, and a rash on his arms and chest. (Pls.' Exs. 5 and 6.)  Ms. Cunningham began to experience similar symptoms, including asthma, in the early 1990s.  (*Id.*)  The Cunninghams visited doctors repeatedly to investigate these symptoms, but did not relay to the doctors any concern that environmental contamination could be causing the symptoms because they "didn't think there was any contamination."  (B. Cunningham Dep. 35:3-4.)  The Cunninghams' doctors finally diagnosed them with allergies and asthma.  (Pls.' Exs. 5 and 6.)

Sometime in January 1996, representatives of the Attorney General of the State of Indiana contacted the Cunninghams regarding an investigation of possible environmental contamination by Masterwear.  (B. Cunningham Dep. 17:19-19:18.)  The investigation included an interview of the Cunninghams by investigator Bill Ingram about Masterwear's operation, as well as the Cunninghams' health problems.  (*Id.*)  The Cunninghams' oral statements to Mr. Ingram were memorialized in writing, and signed on June 8, 1996.  (Cure Ex. B.)  After the interview, Mr. Ingram took air, floor and carpet samples from the Cunninghams' home and received their consent to review their medical records.  (*Id.*)

4

According to the Cures, through their interaction with representatives of the Attorney General, the Cunninghams understood that the Attorney General was investigating the release of possible hazardous chemicals from Masterwear onto the 28 North Main property.  (Cure Br. Supp. Mot. Summ. J. 1.)   The Cures claim that Mr. Ingram informed the Cunninghams that their health problems could be related to Masterwear's misuse of these chemicals.  (*Id.*)  Masterwear goes so far as to say that Mr. Ingram informed the Cunninghams that they might experience respiratory problems if they were exposed to contamination.  (Masterwear Br. Supp. Mot. Summ. J. 4; B. Cunningham Dep. 30:2-4.)  The Cunninghams deny these contentions, stating "Ingram never told the Cunninghams that their illnesses were similar to those that might be caused by . . . dry cleaning chemicals."  (Cunningham Br. in Supp. Cross Mot. Summ. J. 5.)

Apparently the Cunninghams had scheduled an appointment with Mr. Ingram for some time after the interview to discuss the results of his investigation.  (B. Cunningham Dep. 94:17-95:15.)  However, Mr. Cunningham canceled that appointment, allegedly requesting that Mr. Ingram contact them when the results of the investigation became available.  (*Id.*)  Mr. Ingram never contacted the Cunninghams again, nor did any other representative of the Attorney General's Office.  (*Id.*)  As a result, the Cunninghams continued to work and reside in 28 North Main because, as Mr. Cunningham stated, they "went on the assumption that the building was given a clean bill of health, so to speak."  (*Id.* 33:12-34:16.)

The Cunninghams were not contacted regarding possible environmental contamination again until December 1, 2003, via a letter from Kenneth Theisen of the Environmental Protection Agency ("EPA").  (Masterwear Ex. F.)  In that letter, Mr. Theisen informed the Cunninghams that a chemical used in dry cleaning called perchlorethylene ("PCE") had contaminated the 28 North Main property and "could be significant and pose a health concern over the long term."  (*Id.*)  After learning of the PCE contamination, the Cunninghams purportedly contacted the EPA for more information on the chemical and how it related to their health problems.  (B. Cunningham Dep. 130:15-133:22.)  An EPA physician, Dr. Waters, informed them that the symptoms they were experiencing "were definitely the kind caused by prolonged exposure to PCE."  (*Id.*)  The Cunninghams almost immediately vacated the building in January 2004, leaving behind most of their personal belongings.  (*Id.*13:21-14:9.)  They assert that their health problems subsided at that time.  (*Id.* 139:20-140:24.)

The Cunninghams filed a complaint with this court on October 5, 2004.

## II.    STANDARD OF REVIEW

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. of Civ. Pro.

6

56(c).  When deciding a motion for summary judgment, the court considers those facts

that are undisputed and views additional evidence, and all reasonable inferences drawn

therefrom, in the light reasonably most favorable to the nonmoving party.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp. v. Catrett,* 477

U.S. 317, 323 (1986); *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir.

1999).  On cross-motions for summary judgment, each movant must individually satisfy

the requirements of Rule 56, *ITT Indus. Credit Co. v. D.S. Am., Inc.*, 674 F. Supp. 1330,

1331 (N.D. Ill. 1987), and the traditional rules for summary judgment apply even though

both parties have moved for summary judgment.  *Blum v. Fisher & Fisher*, 961 F. Supp.

1218, 1222 (N.D. Ill. 1997).

## III.    DISCUSSION

In their motions for summary judgment, the Defendants request that the court

dismiss all of the Cunninghams' claims as barred by the applicable statutes of

limitations.  As for the gross negligence, negligence and negligent infliction of emotional

distress claims, the applicable statute of limitations is set forth in Indiana Code Section

34-11-2-4 (2005) ("Injury to person or character -- Injury to personal property").  Section

34-11-2-4 states in relevant part: "An action for: (1) injury to person or character, [or] (2)

injury to personal property . . . must be commenced within two (2) years after the cause

of action accrues."  As for the trespass and continuing nuisance claims, Indiana Code

Section 34-11-2-7-3 ("Injury to property other than personal property") provides the

applicable statute of limitations.  Section 34-11-2-7-3 states, "The following actions must

be commenced within six (6) years after the cause of action accrues: (3) Actions for

injuries to property other than personal property . . . ."  *See also Heath v. Walmart Stores, Inc.,* 113 F. Supp. 2d 1294 (S.D. Ind. 2000) (claims of damage to real property are governed by the six-year limitations period of Indiana Code Section 34-11-2-3).  The parties do not dispute that these two Indiana Code provisions provide the statutes of limitations applicable to the Cunninghams' claims.  ("The Cunninghams do not dispute that their claims for injury to their persons or property must be commenced within two years after the cause of action accrues, Ind. Code § 34-11-2-4 (2004), or that their claims for nuisance and trespass must be brought within six years after the cause of action accrues, Ind. Code § 34-11-2-7(3)." (Cunningham Br. Supp. Mot. Summ. J. 8.))

As for when the Cunninghams' claims began to accrue under these statutes, that issue is less clear.  In Indiana, "a cause of action accrues at the time when both legal injury and damage have occurred, resulting in liability."  *Neuhauser v. A.H. Robins Co.*, 573 F. Supp. 8, 9 (S.D. Ind. 1983) (interpreting Indiana law).  *See also City of Hobart Sewage Works v. McCullough*, 656 N.E.2d 1185, 1189 (Ind. Ct. App. 1995).  More specifically, under Indiana's discovery rule, "[a] cause of action accrues, and the statute of limitations begins to run, when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another."  *Doe v. United Methodist Church*, 673 N.E.2d 839, 842 (Ind. Ct. App. 1996).  The Indiana Supreme Court first recognized the discovery rule in *Barnes v. A. H. Robins Co., Inc.*, 476 N.E.2d 84 (Ind. 1985), in which it ruled that a statute of limitations runs from the date when a plaintiff discovers or should have discovered that a claimed injury was "caused by a disease which may have been contracted as a result

8

of a protracted exposure to a foreign substance."  476 N.E.2d at 87.  *See also McDowell v. Johns-Manville Sales Corp.*, 662 F. Supp. 934, 935 (S.D. Ind. 1987); *Groce v. Johns-Manville Sales Corp.*, 662 F. Supp. 936, 937 (S.D. Ind. 1987); *Ford v. Johns-Manville Sales Corp.*, 662 F. Supp. 938, 939 (S.D. Ind. 1987).  Prior to *Barnes,* a statute of limitations began to run upon the occurrence of damage capable of ascertainment, regardless of when a plaintiff knew or should have discovered that damage.  *See, e.g., Montgomery v. Crum,* 161 N.E. 251, 258-59 (Ind. 1928).

Several subsequent cases offer additional guidance on when a cause of action begins to accrue.  One such case is *Evenson v. Osmose Wood Preserving Co. of America*, 899 F.2d 701 (7th Cir. 1990).  In *Everson*, a plaintiff brought a product liability action alleging injuries caused by a wood treatment chemical called chromatic copper arsenate ("CCA").  The plaintiff began working with CCA in 1980 and by 1983 was diagnosed with various conditions including nasal polyps, asthma and allergic rhinitis. In February 1985, he asked his doctor to run tests for CCA in his urine because he was concerned that CCA may have been causing his symptoms.  *Id.* at 702.  In December 1986, the plaintiff consulted with an attorney who was aware of an expert doctor whose opinion was that CCA caused symptoms like those manifested by plaintiff, and in March of 1987, the plaintiff filed his complaint.  *Id.* at 702, 704.  He argued that the statute of limitations did not begin to run until December 1986 when he was informed by the attorney that an expert had concluded that CCA caused symptoms like those he had experienced and that he had a legal cause of action.  The defendant argued that the

9

statute of limitations began running in February of 1985, when the plaintiff suspected that CCA might be the cause of his problems.

In *Evenson*, the United States Court of Appeals for the Seventh Circuit, interpreting Indiana law, held that a plaintiff knows or should have discovered the cause of his or her injury when he or she has or should have discovered some evidence that there was a "reasonable possibility" that the injury was caused by the act or product of another. *Id.* at 705. The Seventh Circuit emphasized that while events short of a doctor's firm diagnosis can provide a plaintiff with evidence of a reasonable possibility that another's act or product caused injuries sufficient to trigger the running of the statute of limitations, there must be something more than the mere suspicion or speculation by a plaintiff who is without technical or medical knowledge. *Id.* The court concluded that the plaintiff's mere suspicions regarding CCA having caused his health problems in February of 1985 did not trigger the time period, and that the plaintiff's suit was not time barred. *Id.*

Another good example is *Allied Resin Corp. v. Waltz*, 574 N.E.2d 913 (Ind. 1991). In *Allied*, a plaintiff employee sued his employer, a chemical manufacturer, for injuries suffered as the result of exposure to chemicals used in the manufacture of polyurethane products. The plaintiff began working with the chemicals in 1982, and in 1983 he began experiencing headaches, shortness of breath, loss of energy, mucous drainage and other symptoms. The plaintiff consulted several specialists, including one that concluded his problems were caused by a deviated septum. An internist, Dr. Erxleben, testified that he told the plaintiff that his symptoms were possibly caused by

10

exposure to chemicals.  However, the plaintiff denied that Dr. Erxleben so advised him. A third physician, Dr. Jetmore, determined that the plaintiff's symptoms were caused by allergies to pollens and dust mites and prescribed shots, but when the plaintiff had not improved by October 1985, Dr. Jetmore did further testing and referred him to Dr. Burnstein.  Dr. Burnstein did more testing and in 1986 ultimately concluded that the plaintiff's symptoms were related to his exposure to the chemicals.

While the Indiana Supreme Court agreed with the plaintiff that he did not have actual knowledge of the causal relationship between his injury and the chemical products until early 1986 when Dr. Burnstein offered a diagnosis, the Court concluded that there was a genuine issue of material fact as to whether plaintiff should have discovered the causal connection in 1984 when Dr. Erxleban testified he informed plaintiff that his symptoms were "possibly caused" by exposure to the chemicals or at some later time.  *Id.* at 915.  The Court remanded the case for further proceedings and resolution of what it described as a fact-sensitive question.  *Id.*

According to the Defendants in the instant case, under this Indiana law the Cunninghams' claims began to accrue in 1996, when representatives of the Attorney General of the State of Indiana put the Cunninghams on notice of its investigation of Masterwear.  The Defendants contend that at that time, the Cunninghams "knew or should have known of their injuries . . . ."  (Cure Br. Supp. Mot. Summ. J. 13.)  And because the Cunninghams did not file the disputed claims until October 5, 2004 (more than six, and certainly more than two, years after the events of 1996), the Defendants argue that the court must dismiss them as time-barred.

11

As expected, the Cunninghams disagree.  They assert their claims did not begin to accrue until December 2003, when the EPA informed them that the samples taken from their property "could be significant and pose a health concern over the long term." (Masterwear Ex. F.)  Under this argument, the Cunninghams' claims would be timely if filed within two years of December 2003 (which they were).  As a result, the Cunninghams seek summary judgment in their favor on the statute of limitations issue.

Most important for the purposes of the instant motions is an examination of the facts regarding the Cunninghams' interactions with Mr. Ingram and other representatives of the Office of the Attorney General during its 1996 investigation of Masterwear.  There are many facts regarding these interactions that are disputed, not the least of which is what was said.  The Cunninghams contend that they "never received anything that indicated there were any risks to them or their clients until December 2003."  (Cunningham Reply Supp. Cross Mot. Summ. J. 22.)  Specifically, they contend that Mr. Ingram never told them that there was any PCE contamination on their property (B. Cunningham Dep. 36:1-8), or that their health problems were similar to those caused by PCE.  (*Id.* 78:9-15).  The Cunninghams also point to the Attorney General's Office's failure to inform them of the results of its investigation—that 28 North Main had been contaminated.  They contend that this omission led them to believe the property was safe.  Mr. Cunningham testified, "I went on the assumption that the building was given a clean bill of health, so to speak."  (*Id.* 34:14-16.)  Ms. Cunningham stated that she "never saw any results of any testing.  When we didn't receive any results, we assumed that there were no problems.  We -- my feeling -- my thoughts

were that if there were problems and they did the testing that they would have let us know." (Mary Ann Cunningham Dep. 66:7-12.)

In contrast, the Defendants present a different and disputed version of the Cunninghams' interactions with representatives of the Attorney General. For example, they contend that Mr. Cunningham was informed that an investigation was being performed to determine if 28 North Main had been contaminated by Masterwear. (*Id.* 28:7-14.) And they state that Mr. Cunningham himself testified that Mr. Ingram indicated that any possible contamination could cause respiratory problems (*id.* 30:2-11), which appears to contradict at least in part Mr. Cunningham's other statements that he and his wife were never informed that their health problems were similar to those caused by PCE. (*Id.* at 78:9-15). Mr. Cunningham also testified that the Attorney General's investigation caused him to be "concerned that [any contamination] might be the source of some of our health problems. Also concerned that it might -- it could cause difficulties -- health problems for our clients." (*Id.* 31:1-5.)

Also disputed are the facts surrounding a statement given by the Cunninghams regarding their meeting with representatives from the Attorney General's Office. The statement was memorialized in a typewritten document that the Office of the Attorney General apparently prepared. (Cure Ex. B.) Signed and dated by Mr. and Ms. Cunningham on June 8, 1996, the statement document describes the Cunninghams' health problems, including respiratory difficulties and asthma. It also sets forth the Cunningham's knowledge of Mr. Reed's use of 28 North Main, and how in 1994 the

Cunninghams purchased the property from the Cures and believed it to be worth $130,000 as of June 1996.

On the statement document, someone crossed out part of the typewriting that described Mr. Cunningham's health problems as having appeared "after the three spills by Jim Reed's operation in 1990 - 1991, which all happened after a fire, and all happened in approximately a six month period of time." In place of that text, he or she handwrote that the symptoms appeared and "began after November of 1987." The Cunninghams initialed that change when they signed the statement document in 1996. The Cunninghams contend that had they linked their health problems to Masterwear or Mr. Reed at the time of signing the statement document, they would not have changed the text to disavow any such connection. This certainly is one reasonable inference that can be drawn from the alteration made to the typewritten document. The change suggests that while the Cunninghams knew they were experiencing some health problems after November 1987, they did not know the cause of those problems. In evaluating this case at the summary judgment stage, the Cunninghams have the benefit of such a reasonable inference.

As for the Cunninghams' health problems, the parties dispute their extent and frequency, which may go to when the Cunninghams should have begun investigating their cause. The Cunninghams describe their symptoms as long term, not simply infrequent reactions to known exposure to chemicals. In fact, Mr. Cunningham believed he may have had something in his throat such as cancer causing his persistent cough. (Pls.' Ex. 5, p. 3.) And Ms. Cunningham suspected she had long term allergies and

asthma.  (M. Cunningham Dep. 31:1-14.)   The Cunninghams' physicians diagnosed them with allergies, which apparently gave them no reason to believe that their symptoms were brought on by one particular instigator, including chemical exposure.

The Defendants argue that the evidence indicates that the Cunninghams had more distinct problems.  On two occasions the Cunninghams smelled chemicals in the 28 North Main property and experienced burning in their eyes and lungs.  As a result, they were forced to temporarily vacate the property.  Because of the seriousness and on and off nature of the Cunninghams' symptoms, the Defendants suggest that the Cunninghams should have been aware of, or at least investigated, the cause of their symptoms immediately.  This may be a reasonable inference.  However, it is undisputed that the Cunninghams experienced only two such isolated instances during their seventeen years at 28 North Main, and that even then, they did not believe those instances to be serious.  Their continued occupancy of the premises gives rise to an inference that they considered those incidents to be trivial and non-hazardous.

The Cunninghams were never informed that they had a specific injury and that there was a reasonable possibility, if not probability, that their injury was caused by a specific acts or series of acts, as was the case in *Degussa Corp. v. Mullens*, 695 N.E.2d 172, 178 (Ind. Ct. App. 1998).  In that case, the Indiana Court of Appeals rejected a plaintiff's argument that the two-year statute of limitations did not begin to run until she learned with certainty that her illness was related to her exposure to chemicals, and concluded that the statute began to run when the plaintiff's doctor informed her of the possible causal link and the need to investigate further.  The Court of Appeals reasoned

15

that it was at that point that the plaintiff should have discovered the causal link, and that it was not necessary that she know with certainty that the chemicals at work were causing her illness.  Here, the Cunninghams were not provided with a specific diagnosis of their injuries; instead, they were inconclusively diagnosed with allergies or asthma, long term ailments common in the general population and certainly not specific to chemical exposure.  Of course, events short of a diagnosis can provide a plaintiff with enough evidence to take action, but only once a plaintiff's doctor expressly informs the plaintiff that there is a reasonable probability that an injury was caused by an act or product.  *Dorman v. Osmose, Inc.*, 782 N.E.2d 463, 467 (Ind. Ct. App. 2003); *see also Morgan v. Columbus McKinnon Corp.*, 837 N.E.2d 546, 549-50 (Ind. Ct. App. 2005).  In this case, though, none of the Cunninghams' doctors or anyone else informed them that their symptoms were the result of exposure to chemicals, as was the case in *Degussa.*

If the Cunninghams had information or suspicion adequate to put them on notice of the cause of their injuries, they likely would have questioned their doctors about that cause.  Their failure do to so suggests that the Cunninghams had even less knowledge regarding the cause of their injuries than similar plaintiffs whose claims have been permitted to proceed as timely.  *See Evenson,* 899 F.2d at 705 (plaintiff's repeated attempts to get medical treatment for injuries constituted only a "mere suspicion" of knowledge not adequate to trigger accrual of the statute of limitations); *Dorman*, 782 N.E.2d at 467 (plaintiff's suspicion regarding the cause of his injuries is not sufficient to trigger accrual of the statute of limitations).  If anything, the Cunninghams' failure to

investigate the cause of their injuries with greater fervor may be most relevant to the extent of their damages, if any.

The Cunninghams' purchase of the 28 North Main property from the Cures in 1994, after having observed Masterwear's industrial use of it for years, also poses inferential support for the concept that they did not believe it to be a significant environmental risk.  Indeed, Mr. Cunningham believed that Masterwear used part of the second floor only for office space, and part for storage.  (B. Cunningham Dep. 11:5-17.) Had the Cunninghams had reason to believe the building was contaminated, a reasonable trier of fact could conclude that they would not have purchased it at all, to say nothing of their documented belief that its value more than doubled in just two years.  And that the Cures retained ownership of part of the building undoubtedly reassured the Cunninghams that there was nothing seriously wrong with the building. Like the Cunninghams, a reasonable person could have believed that had there been environmental contamination of 28 North Main, the Cures would have vacated the entire building.  The Cures' lack of knowledge of contamination, or at least their failure to inform the Cunninghams of any such knowledge, is telling.

Moreover, before the Cunninghams purchased 28 North Main, the property apparently was subjected to an environmental inspection carried out by their lender. When they received financing for the property, the Cunninghams believed that the property had passed the inspection because "the appraisal said [the inspection] went through and the bank approved."  (M. Cunningham Dep. 38:19-23.)  A reasonable person in the Cunninghams' position could have accepted such a representation from

17

their lender as an accurate assessment of the property's condition.  After the purchase, the Cunninghams made renovations to the property costing $50,000, including adding new heating and cooling systems and a new roof.  (*Id.* 41:7-12.)  Spending such a substantial sum on these improvements suggests that the Cunninghams felt assured that the property was not contaminated, and that their respiratory problems did not result from any contamination.  However, in contrast, the $50,000 purchase price for the property could be inferred by a reasonable person to be a deflated price, the result of possible contamination.  Mr. Cunningham acknowledges that the price was not the result of negotiations, and that he did not know how Mr. Cure arrived at that particular figure.  (B. Cunningham Dep. 13:11-20.)  These conflicting inferences are both reasonable.

Finally, upon receiving word from the EPA that the 28 North Main property had been contaminated, the Cunninghams almost immediately vacated the property.  This suggests that had they been aware of problems any earlier, they would have acted upon them immediately.  They did not.  Thus, it is reasonable to infer that the Cunninghams did not know of the environmental issues with their property until that point in 2003.

Whether the Cunninghams should have known about those problems before 2003 is less clear.  One could say that the Attorney General's 1996 investigation put them on notice of Masterwear's problems with environmental contamination.  Given the admitted health concerns arising from that investigation, a reasonable person might have been compelled to seek out its final results.  This is particularly true because at the

18

time of the investigation, Mr. Ingram took air, floor and carpet samples from the 28

North Main property to be tested for contamination, with the Cunninghams' permission.

One could believe that this action, coupled with the disputed testimony of what

representatives of the Attorney General may have told the Cunninghams,[2] and the

Cunninghams' prior knowledge regarding Masterwear's use of chemicals, should have

tipped them off that their respiratory problems were being caused at least in part by

contamination by Masterwear.  It is fair to say that further inquiry by the Cunninghams

would have been a reasonable, prudent thing to do.

But upon closer examination of the facts, some of which are disputed, one could

equally say that the Attorney General's failure to inform the Cunninghams of any

positive results of the investigation put to rest any fears of potential contamination.

That, coupled with the Cunninghams' fairly common injuries, and no statement of a

definitive cause of those injuries by a doctor, may have lulled the Cunninghams into

believing that their injuries were common and unrelated to Masterwear.  This is

especially true given that the Cunninghams' symptoms remained twelve years after

Masterwear had vacated the property.  At best, the parties have presented the court

with competing inferences, both of which are reasonable.  Such a conflict must be

---

[2] No party submitted to the court any relevant deposition testimony of the Attorney
General's representatives.  While the court has reviewed the excerpts of Mr. Ingram's testimony
to which it has access (Pls.' Ex. 8), none bear on his interactions with the Cunninghams during
the 1996 investigation.  It would have been useful to ascertain from the representatives'
standpoints what they believe they told the Cunninghams regarding the Masterwear
contamination, as well as the Cunninghams' reactions.  Because the parties did not submit this
evidence to the court (if it even exists), the court must rely on the Cunninghams' accounts of the
interactions alone.  However, even if any testimony by the Attorney General's representatives
conflicted with the Cunninghams', the court cannot weigh the credibility of the meeting
participants at this stage of the proceeding.

resolved by the trier of fact.  So it cannot be said that additional inquiry by the Cunninghams was the *only* reasonable thing for them to do subsequent to the Attorney General's visit.

These issues regarding the critical question of when the Cunninghams, in the exercise of ordinary diligence, should have had knowledge of their injuries and Masterwear's involvement remain outstanding.  As a result, it cannot be said that the evidence indisputably establishes that the Cunninghams acquired knowledge sufficient to lead a reasonably diligent person to discover Masterwear's alleged wrongdoing and the Cunninghams' resulting injuries.  As has been stated by the Indiana Supreme Court, "The question of when a plaintiff discovered facts which, in the exercise of reasonable diligence, should lead to the discovery of the [wrongdoing] and resulting injury, is often a question of fact," *Van Dusen v. Stotts,* 712 N.E.2d 491, 499 (Ind. 1999) (citing *Burks*, 534 N.E.2d at 1104-05; *Allied Resin Corp.*, 574 N.E.2d at 915), and such is the case here.  Therefore, summary judgment on the statute of limitations issue is inappropriate under Federal Rule of Civil Procedure 56(a) and (b).

## IV.    CONCLUSION

For the reasons stated above, Defendants William J. Cure and Elizabeth J. Cure's Motion for Summary Judgment (Docket No. 42); Plaintiffs' Cross Motion for Partial Summary Judgment (Docket No. 49); and Defendants Masterwear Corporation, James A. Reed and Linda Lou Mull Reed's Motion for Summary Judgment (Docket No.

53) are **DENIED**.  The question of whether this action was commenced within the time

allowed by the statute of limitations will be determined by the trier of fact.

ALL OF WHICH IS ENTERED this 1st day of March 2006.

_____

John Daniel Tinder, Judge
United States District Court

Copies to:

Frank J. Deveau
Sommer Barnard Attorneys, PC
fdeveau@sommerbarnard.com

Raymond L. Faust
Norris Choplin & Schroeder LLP
rfaust@ncs-law.com

Bruce L. Kamplain
Norris Choplin & Schroeder LLP
bkamplain@ncs-law.com

Jana K. Strain
Price Waicukauski Riley & Debrota
jstrain@price-law.com

Brad R. Sugarman
Sommer Barnard Attorneys, PC
bsugarman@sommerbarnard.com

William C. Wagner
Sommer Barnard Attorneys, PC
wwagner@sommerbarnard.com

Ronald J. Waicukauski
Price Waicukauski Riley & Debrota
rwaicukauski@price-law.com