UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BILLY J. AND MARY ANN CUNNINGHAM, )
                                                )
        Plaintiffs,            )
                                                  )
      vs.                         )        1:04-cv-1616-JDT-WTL
                                                  )
                                                )
MASTERWEAR, INC., a/k/a AMERICAN   )
DRY CLEANING & LAUNDRY INC., a/k/a  )
AMERICAN GLOVE COMPANY, JAMES A. )
REED, and LINDA LOU MULL REED,   )
                                                )
        Defendants.          )

**ENTRY ON DEFENDANTS' MOTION IN LIMINE PURSUANT TO RULE 702, FEDERAL RULES OF EVIDENCE TO PRECLUDE THE TESTIMONY OF D. DUANE HOUSER, M.D. AND BRAD BOMBA, SR., M.D. (Doc. No. 96.)[1]**

Plaintiffs in diversity sue Defendants in common law tort, including claims of negligence, trespass, and nuisance, for injuries allegedly caused by perchloroethylene (PCE) contamination on their property from Defendants' dry-cleaning business. Defendants seek, pursuant to Federal Rule of Evidence 702, to have the court order inadmissible the report and testimony of two expert witnesses for the Plaintiffs. The experts, Drs. D. Duane Houser and Brad Bomba, Sr., submitted reports indicating they would testify that PCE contamination was the cause of Plaintiffs' illnesses.

---

[1] This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

I.      **Background**

Plaintiffs Billy J. and Mary Ann Cunningham believe they were exposed to PCE in their photography studio and home in downtown Martinsville, Indiana, from 1986 until 2003.  While working and later living at the property, the Cunninghams experienced chronic respiratory ailments and headaches.  Their neighbor, Defendant Masterwear, Inc. ("Masterwear") operated a dry-cleaning business in an adjacent building until 1991. Masterwear has been accused of improperly storing hazardous chemicals, including PCE, and has been required to conduct removal activities by the United States Environmental Protection Agency ("EPA").  *See Ohio Cas. Ins. Co. v. Reed*, No. 1:04-cv-2027-DFH-WTL, 2006 WL 2348957 (S.D. Ind. Aug. 11, 2006).[2]

Plaintiffs filed suit October 5, 2004.  On March 1, 2006, the court denied cross-motions for summary judgment on the issue of whether this action was commenced within the time required by the statute of limitations.  (Doc. No. 65.)  On January 26, 2007, Defendants filed a motion to strike the testimony and reports of Drs. Houser and Bomba under Federal Rule of Evidence 702.  (Doc. No. 99.)  The motion is ripe and court rules as follows.

---

[2]  The contamination at the site has been well documented and has, including this case, led to four separate lawsuits filed in this District.  *See* Complaint, *City of Martinsville v. Masterwear Corp.*, No. 1:04-cv-1994-RLY-WTL (S.D. Ind. Dec. 7, 2004); Complaint, *Ohio Cas. Ins. Co. v. Reed*, No. 1:04-cv-2027-DFH-WTL (S.D. Ind. Dec. 13, 2004); Complaint, *United States v. Masterwear Corp.*, No. 1:05-cv-0373-JDT-WTL (S.D. Ind. March 16, 2005).

## II.      Discussion

### A.      Federal Rule of Evidence 702 and *Daubert*

Defendants challenge the admissibility of the Plaintiffs' medical experts.  To be admissible, expert testimony must satisfy the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Rule 702 has been amended since the *Daubert* decision but the Seventh Circuit teaches that while "Rule 702 has superseded *Daubert* . . . the standard of review that was established for *Daubert* challenges is still appropriate."  *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005).

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under *Daubert*, the court is to act as "gatekeeper" by considering both the relevance and the reliability of the expert's evidence.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  The Seventh Circuit requires district judges to determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is itself reliable.  *Zelinski v. Columbia 300, Inc.*, 335

F.3d 633, 640 (7th Cir. 2003) (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)).

The Supreme Court teaches that the reliability of an expert's testimony is determined by focusing on the methodology of the expert rather than his or her conclusions. *Daubert* 590 U.S. at 595. In *Daubert*, the Court listed non-exclusive factors to assist district courts in determining reliability of a particular methodology, including whether the conclusion is testable, whether the conclusion is subject to peer review, the potential or known error rate, and the general acceptance of the theory. *Id.* at 593-94.

Yet sometimes the methodology/conclusion distinction is impractical and even unhelpful. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("But conclusions and methodology are not entirely distinct from one another"). It is not enough for an expert to say this is my data and that is my conclusion without connecting the two. *Id.* ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") The court must determine that the expert's opinion is grounded in the "methods and procedures of science." *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 344 (7th Cir. 1995).

A district court may exclude expert testimony when it determines that the underlying facts or data cannot support the conclusion—i.e., when the analytical gap between the two is too great to put the conclusion before a jury. *See, e.g.*, *United*

*States v. Mamah*, 332 U.S. 475, 478 (7th Cir. 2003) (affirming exclusion of opinion of likelihood that confession was false based on studies only tangentially related to facts of case); *Target Mkt. Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998) (affirming exclusion of opinion on revenue projections based on unwarranted assumptions).

Defendants ask the court to exclude the reports and opinions of Houser and Bomba with respect to causation.  Causation from an external cause is sometimes broken down by the courts into general and specific causation.  *See* Mary Sue Henifin, Howard M. Kipen & Susan R. Poulter, *Reference Guide on Medical Testimony* 444-45, *in* Reference Manual on Scientific Evidence (2nd ed. 2000).  Proving general causation means that exposure to a certain substance can cause a particular ailment.  *Id.*  It can usually be demonstrated by a review of the scientific and medical literature.  Specific causation means that the exposure in this case caused the ailment in this case.  *Id.*

Plaintiff provides Houser and Bomba to testify both to general and specific causation.  Using the standard required by Rule 702 and *Daubert*, this court will analyze the methodology used in the report and testimony of Houser, and then the report and testimony of Bomba.  Finally, the court will evaluate the qualifications of both Houser and Bomba.

**B.      Houser Report and Testimony**

Dr. D. Duane Houser is a medical doctor specializing in occupational respiratory disorders.  He has been retained by the Plaintiffs as an expert in this case.  He graduated from Indiana University School of Medicine in 1965 and has been practicing medicine for over forty years.

Defendants argue is that Houser's report and testimony are not based on a reliable methodology.  Houser submitted a report in this case pursuant to Federal Rule of Procedure 26(a)(2)(B).  This report begins with an "Executive Summary" which lists six "opinions".  They are:

1.  Masterwear operation did not properly dispose of perchlorethylene [sic] (PCE).

2.  Billy J. and Mary Ann Cunningham inhabited an adjacent building with a photography studio from April 1987 to 2004.  In and around 1992, the Cunninghams purchased the building and ultimately began using the second floor as their personal residence.  All together, the Cunninghams worked full time for around 18 years and resided as well for just short of ten years in a space directly adjoining the Masterwear site that was contaminated by PCE.

3.  In the mid 1990's, Mary Ann had recurring respiratory problems.  She was ultimately diagnosed with asthma by her family physician in 1996.  Mary Ann also had decreased cognitive symptoms with short term memory loss and severe fatigue.  She also had severe headaches requiring headache medication several times a week.  All of these symptoms were secondary to chronic toxic PCE exposure.

4.  Billy Cunningham developed daily, severe headaches upon awakening each morning.  He also had chronic nasal congestion and a hacking cough.  The nasal congestion and hacking cough were present on a daily

-6-

basis in spite of being treated with multiple forms of therapy.  In addition, he would have times when he would get secondary sinobronchitis.  He was also severely fatigued.  These symptoms were also secondary to chronic PCE exposure.

5.  Studies have shown that individuals living adjacent to dry cleaning establishments can have chronic PCE expousre.

6.  PCE has been classified as a probable carcinogen in humans.

(Pls.' Ex. 1, at 2.)  Strictly speaking, only the last sentences of paragraphs 3 and 4 are Houser's conclusions; the rest are either assumptions or background facts.

What methodology does Houser employ to arrive at his conclusions on general and specific causation?  The Defendants contend that Houser did not use "a valid scientific methodology to reach his conclusion."  (Defs.' Br. 10.)  In particular, Defendants note that Houser does not use a set of principles called the Hill criteria which are generally used by epidemiologists to distinguish between correlation and causation.[3]  Yet as long as Houser used a reliable method to come up with his

---

[3]  Stated succinctly, the Hill criteria are:

1. temporal relationship;
2. strength of the association;
3. dose-response relationship;
4. replication of the findings;
5. biological plausibility (coherence with existing knowledge);
6. consideration of alternative explanations;
7. cessation of exposure;
8. specificity of the association; and
9. consistency with other knowledge.

*Reference Guide on Epidemiology, in* Reference Manual on Scientific Evidence 375.  According to A. Bradford Hill, the creator of the criteria, the factors are not a checklist for definitive proof of
(continued...)

-7-

conclusions, it is not a problem that he did not use the method that Defendants claim is "useful."

The Plaintiffs claim that Houser followed the methodology laid out in the *Reference Guide on Medical Testimony*.  (Pls.' Br. 4-5.)  The *Guide* describes a four step process:

> In the *first* step the physician must establish the characteristics of the medical condition.  *Second*, he or she defines the nature and amount of the environmental exposure.  The *third* step is to demonstrate that the medical and scientific literature provides evidence that in some circumstances the exposure under consideration can cause the outcome under consideration.  This step is synonymous with establishment of general causation.  As part of this, the clinician attempts to establish the relationship between the dose and response, including whether thresholds exist, ultimately defining the clinical toxicology of the exposure.  The *fourth* step is to apply this general knowledge to the specific circumstances of the case at hand, incorporating the specifics of exposure, mitigating or exacerbating influences, individual susceptibilities, competing or synergistic causes, and any other relevant data.

Mary Sue Henifin, Howard M. Kipen & Susan R. Poulter, *Reference Guide on Medical Testimony*, *in* Reference Manual on Scientific Evidence 468-71 (2d ed. 2000) (emphasis added).  However, examining Houser's report reveals a few rather large analytic gaps in his application of steps two through four of this methodology.  In other words, Houser failed to "appl[y] the principles and methods reliably to the facts of the case" as required by Federal Rule of Evidence 702.  The court will analyze each of the four steps of the methodology Plaintiffs claim that Houser employed.

---

[3](...continued)
causation, but are rather an aid to the inferential process.  *Id.* at 376 (citing A. Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965)).

### 1.    Step One: Medical History

Page three of Houser's report contains a summary of the Cunningham's conditions based on a review of their medical records.  Houser documents Mrs. Cunningham's asthma as beginning with "itchy, burning, running eyes, nasal congestion, and a hacking cough" shortly after she began working at 28 North Main in 1986.  (Pls.' Ex. 1, at 3.)  After being diagnosed with Cough Variant Asthma, an asthma with a cough as the predominant symptom, she was treated with various therapies.  None of these provided more than temporary relief.  Mrs. Cunningham also experienced cognitive symptoms with fatigue and short-term memory problems.  She suffered severe headaches that required injections of a drug called Imitrex.  Since moving out, her cognitive symptoms have "improved dramatically." (*Id.*)  Her asthma, on the other hand, "was only transiently improved." (*Id.*)

Mr. Cunningham also had respiratory and cognitive symptoms.  He had severe headaches, daily and chronic "nasal irritation," congestion and a hacking cough.  Like his wife, he also suffered from fatigue.  He developed infectious sinobronchitis on several occasions and reacted poorly to the therapy.  Houser claims that when the Cunninghams were away from their home, their symptoms would improve.  He also notes that Mr. Cunningham suffers from Ménière's disease, which he describes as a disease of the inner ear causing decreased sense of hearing, ringing in the ear and severe vertigo.  He does not believe that this condition is related to the PCE exposure.

##    2.    Step Two: Nature and Amount of Exposure

The second step is where Houser's analysis begins to fall apart.  It begins well enough; pages four through seven of the report detail the results of the studies conducted to determine the levels of contamination in the Cunninghams' home.  In particular, Houser discusses two comprehensive reports detailing the contamination at the Cunninghams' property: the Battelle Report and a report from the EPA.  Battelle is an environmental consulting company that was hired by the Indiana Attorney General's office to conduct an evaluation of the property in 1996.  The Battelle Report contains four measurements of PCE in the air in the Cunningham's home ranging from 4552 to 6675 micrograms per cubic meter ($\mu g/m^3$) or 670 to 983 parts per billion (ppb).  (Defs.' Br. Resp. Summ. J. Ex. E, at 26.)  This is far greater than the Indiana Department of Environment Management (IDEM) sub-chronic action level of 110 $\mu g/m^3$.  According to Houser, the EPA report confirms that the PCE in the air was above the IDEM action levels and adds that PCE in the groundwater was 20,000 ppb and that PCE in the soil was 270,000 ppb.

Relying on reports prepared by others is an acceptable way to determine the nature and extent of exposure; however, Houser never expresses an opinion as to the level or type of exposure that the Cunninghams faced.  He says only "there is no doubt that the Cunningham property suffered significant PCE contamination."  (Pls.' Ex. 1, at 7.)  This is not a trivial omission even given the measurements stated in the reports. While he reiterates the measurements taken by the government, this is not the same thing as a finding or even an assumption as to the dose and duration of exposure.

As Defendants point out in their briefs, "it is the dose that makes the poison."  *See* Bernard D. Goldstein & Mary Sue Henifin, *Reference Guide on Toxicology*, *in* Reference Manual on Scientific Evidence 403 (2d ed. 2000).  It may be that Plaintiffs were exposed to PCE, but if that the dose and duration that they were exposed to is medically insignificant, then it is irrelevant to their condition.  *See Amorgianos v. Nat. R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 163 (E.D.N.Y. 2001) (noting that to meet *Daubert's* "fit" requirement experts testifying to general causation would have to show that the dose and duration of exposure actually experienced by plaintiff can cause the plaintiff's condition).

Houser seems to be working on the assumption that if the amount of PCE in the air at the Cunningham's exceeds any government limit then it must be bad enough to cause all of Plaintiffs' problems.  But this is not necessarily the case.  As the Battelle Report itself warns: "Health guidelines have a degree of uncertainty and heath guidelines values calculated from scientific studies use standardized uncertainty factors.  Therefore, health guidelines should not be considered strict boundaries between toxic and nontoxic levels."  (Defs.' Br. Resp. Summ. J. Ex. E, at 22.)  The government levels for a substance are not set for the purpose of proving the causation of every ailment suffered by those exposed to the substance.  It could be, for example, that the EPA or IDEM believe that a certain level of Chemical X in the air poses some risk of cancer that is unacceptable given the slight usefulness of Chemical X.  That does not mean that the levels of Chemical X present are great enough to produce another illness, say heartburn, even if evidence shows that *some* level of Chemical X can produce heartburn.

The Seventh Circuit dealt with an analogous case in *Wintz v. Northrop Corp.*, 110 F.3d 508 (7th Cir. 1997).  In *Wintz*, the Seventh Circuit affirmed the exclusion of a toxicologist's testimony on general causation.  The toxicologist opined that bromide caused the plaintiff's birth defects; however, he gathered no information about the specifics of the plaintiff's mother's exposure.  The toxicologist knew that the mother had worked with bromide and the child had symptoms consistent with bromide exposure, but that is not enough to survive a *Daubert* motion.  As the Seventh Circuit explained:

> Thus, as the district court concluded, Elenbogen's methodology in attempting to relate the general principles of toxicology and bromide exposure to the facts of this case appears to have been based less on a scientific understanding of the specifics of Jill Wintz's workplace exposure and the potential effects on Jessica, and more on merely a general understanding of bromide, with only unsupported speculation having been used to relate the general knowledge to the facts surrounding Jill Wintz's exposure.  At a minimum, it was not manifestly erroneous for the district court to conclude that, despite Elenbogen's general qualification as a toxicologist, his proferred testimony as to proximate causation in this case was not sufficiently based on scientific methodology to be admissible.

*Id.* at 514.  So it is with this case, Houser has to show that the specific dose and duration of exposure can cause the conditions suffered by the Cunninghams.  This is impossible without an explanation of what that dose and duration of exposure were.

### 3.    Step Three: Medical and Scientific Literature

This gap in the analysis is further complicated by Houser's near total failure to conduct any analysis at the third step.  A district court has the discretion to exclude an expert's testimony when "there is simply too great an analytic gap between the data and the opinion proffered."  *Joiner*, 522 U.S. at 146.  In *General Electric Co. v. Joiner*, 522 U.S. 136, the Supreme Court, reversing the Eleventh Circuit, held that a district court was within its discretion to exclude the testimony of plaintiff's experts.  Plaintiff's experts would have testified, ostensibly relying on animal studies and four epidemiological studies, that plaintiff's lung cancer was "promoted" by exposure to polychlorinated biphenyls (PCBs).  The district court found that the reports relied upon did not support their contention.

The animal studies involved infant mice being injected with massive amounts of PCBs.  Plaintiff was an adult human who had been exposed to far lesser dose of PCBs.  Further, the type of cancer he had was different from the type of cancer found in the mice in the study.  The Supreme Court explained that the district court was within its discretion to reject the expert's use of the reports because the "studies were so dissimilar to the facts presented in this litigation."  *Id.* at 144.

The Supreme Court also agreed that the district court was within its discretion to conclude that the four epidemiological studies "were not a sufficient basis for the experts' opinions."  *Id.* at 145.  One involved a study showing higher levels of lung cancer than expected among Italian workers exposed to PCB, but the authors "were unwilling to say that PCB exposure had caused cancer among the workers they examined."  *Id.*  Another study found elevated lung cancer rates at a Monsanto PCB production plant but this

"was not statistically significant."  *Id.*  The third study did find a statistically significant

increase in lung cancer death's among workers at a Norwegian cable manufacturing

company exposed to mineral oil; however, the study did not specifically mention PCBs.

The fourth study found a statistically significant increase in lung cancer deaths among a

particular group of Japanese workers exposed to PCBs, but this group had also been

exposed to "numerous potential carcinogens."  *Id.* at 146.

Houser's contentions are less supported than plaintiff's experts' contentions in

*Joiner.*  Houser nowhere says what level of exposure to PCE would be necessary to

cause the Cunninghams' conditions.  He makes the general statement that "PCE toxicity

has been associated with respiratory diseases.  These have been well documented in

human and animal studies."  (Pls.' Ex. 1, at 7.)  But Houser then cites two papers that do

not support that statement.  The first is a study with rats exposed to PCE gas at 300

parts per million (ppm) for 6 hours daily for five days.  But Houser never explains how

this is relevant to the Cunninghams' case.  The concentration of PCE in the air of their

home was less than 1 ppm.[4]  The Cunninghams' exposure was chronic rather than

acute; thus, the link between the study on rats is not clear.  *See Joiner*, 522 U.S. at 144.

The other reference was not a study, but rather a single paragraph within a piece

mentioning that a single case has been cited where pulmonary edema[5] resulted from

---

[4]  1 ppm = 1000 ppb.  The PCE levels measured in the Cunningham home ranged from 670 to 983 ppb.

[5]  Pulmonary edema is the swelling or accumulation of fluid in the lungs.  It has many possible causes, one of which is the inhalation of toxic gases.  MedlinePlus Medical Encyclopedia: Pulmonary Edema, http://www.nlm.nih.gov/medlineplus/ency/article/000140.htm (last visited Apr. 10, 2007).

PCE exposure.  It does not mention how much exposure to PCE the patient had.

Pulmonary edema is not the same thing as asthma or a sinus infection.  And one case is

certainly not "statistically significant."  Therefore, it is not enough to support Houser's

contention.

Houser's attempt to connect the headaches suffered by the Cunninghams is also

tenuous.  Houser explains "[o]bviously, there have been no long term studies where

humans are intentionally chronically exposed to high levels of PCE."  (Pls.' Ex. 1, at 8.)

But Houser explains that volatile organic compounds (of which PCE is one) have been

associated with something called Sick Building Syndrome.  Sick Building Syndrome has

been associated with chronic headaches, fatigue, and neurocognitive symptoms.  The

trouble is that Houser again does not state what levels of PCE are necessary to observe

these symptoms in humans, nor does he claim that PCE has even been associated with

Sick Building Syndrome at all.

Houser does say that throat irritation and a hacking cough "have been described

even in chronic exposure to low levels of the chemical."  (*Id.*)  However, his citation is

again to that lone case of pulmonary edema, which did not say to how much PCE the

patient was exposed.  In his deposition, Houser admitted that this was a mistake and

claimed that there was a study that backed up this point.  (Houser Dep. 174.)  However,

that study was not presented to the court.  The only thing demonstrating "that the

medical and scientific literature provides evidence that in some circumstances the

exposure under consideration can cause the outcome under consideration" is Houser's

say so.  But this is not enough to put that opinion before the jury.

-15-

### 4.        Step Four: Specific Causation

Even if one assumes that Houser can show general causation, his opinion on specific causation would still be inadmissible under Rule 702.  The extent of Houser's analysis of specific causation can be summarized: general causation ergo specific causation.  In other words, he goes from an analysis that PCE *can* cause these types of symptoms directly to his conclusion that they did cause the symptoms in this case.  He does mention the temporal relationship between the symptoms and their living in the house, but this alone is not enough to survive a *Daubert* motion.

For the most part, Houser does not even attempt to eliminate other possible causes of the Cunninghams' symptoms.  For example, Houser never mentions allergens or Mr. Cunningham's alcohol abuse as possible causes of Mr. Cunningham's sinus infections or the sinus infections as a possible cause of his headaches.  Houser also never mentions the possibility that given Mrs. Cunningham's family history of asthma, genetics may be the cause of her condition.

Houser does mention exposure to photographic chemicals as a possible cause. He states: "During Mr. Cunningham's deposition taken April 29, 2005, examiners were wondering about the plaintiff's exposure to photo development chemicals."  (Pls.' Ex. 1, at 8.)  Houser says that while Mr. Cunningham worked with the photographic chemicals as a hobby (i.e., before he occupied the property next to Masterwear), he never had any symptoms.  He further argues that chemicals used for development are always "in a closed and not an open system."  He does not explain what this means or why that is

significant.  The Battelle Report is not as quick to dismiss the possibility that the photo chemicals might be causing health problems.  The report notes a "photo-processing" odor on the first floor of the Cunninghams' property.  (Defs.' Br. Resp. Summ. J. Ex. E, at 8.)  It further notes that "[t]hese chemicals may be contributing to the health effects reported by the Cunninghams."  (*Id.* at 46.)  Houser's analysis gives little reason to eliminate other possibilities other than his own speculation.

A district court may exclude testimony if the analytic gap between the data and the conclusion are too great.  Such is the case here.  There are three gaps that together—even separately—are sufficient to exclude the report and testimony as to causation.  First, Houser makes no determination as to the level or type of exposure to PCE the Cunninghams faced and whether this would be enough to cause the symptoms they exhibited.  Second, Houser failed to properly show that the medical and scientific literature demostrates that these types of symptoms are possible at all.  Third, Houser failed to demonstrate that PCE exposure was the specific cause of the Cunninghams' ailments.  For these reasons *Daubert* and Rule 702 require that Houser's conclusion that PCE exposure caused the Cunninghams' illnesses be excluded.

This is not to say that all of Houser's testimony and report is excluded.  Houser can still testify as to the illnesses that the Cunninghams had.  He is a medical doctor and the Defendants have presented no reason why his review of the medical record would not allow him to testify, for example, that the Cunninghams had respiratory ailments and the timing of those ailments.  However, Houser will not be allowed to testify that he believes that PCE exposure caused these ailments.  For these reasons Defendants'

motion will be **GRANTED** so far as it pertains to Houser's opinion on the cause of Plaintiffs' ailments.

### C.    Bomba Report and Testimony

Dr. Brad Bomba, Sr. was the treating physician of the Cunninghams from 1986 until 2000.  (Pls.' Ex. 6, at 1; Bomba Dep. 64.)  Bomba submitted a report dated April 2, 2006, like Houser, pursuant to Federal Rules of Civil Procedure 26(a)(2)(B).  The report consists of one page where Bomba lays out his opinions, a curriculum vitae, and two pages listing the documents he reviewed.  Bomba writes that he reviewed the reports detailing the PCE contamination at the Cunninghams' home, and he then gives an opinion on the cause of the Cunninghams' illnesses:

> In light of this evidence of PCE contamination and after reviewing the Cunninghams' medical records, it is my opinion that chronic toxic PCE exposure caused several of the medical problems that Bill and Mary Ann Cunningham experienced during the years that they were my patients, including Mary Ann's asthma and recurring severe headaches and Bill's persistent hacking cough and chronic headaches.

(Pls.' Ex. 6, at 1.)

Other than a reference to the materials reviewed, Bomba provides no basis for this opinion in his report.[6]  It is impossible to determine what, if any, methodology he

---

[6]  In tacit acknowledgment of the perfunctory nature of this report, Plaintiffs argue that Bomba should be allowed to testify regardless of whether or not he provided a report.  They cite *Musser v. Gentiva Health Systems*, 356 F.3d 751, 757 (7th Cir. 2004) (citing Fed. R. Civ. P. 26, cmt. 1993) but this is of no avail.  The case and comments highlight the difference between retained expert witnesses and witnesses providing expert testimony for the purposes of who

(continued...)

used.  His deposition is not much help either.  The Seventh Circuit has taught "that 'an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'" *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) (quoting *Mid-State Fertilizer Co. v. Exch. Nat. Bank.*, 877 F.2d 1333, 1339 (7th Cir. 1989)).  Bomba's five-page offering is totally devoid of reasoning and therefore "supplies nothing of value to the judicial process."

The Cunninghams attempt to salvage Bomba's opinion that PCE caused their illnesses by claiming that a treating physician does not need even to provide a report in order to testify.  Their argument seems to be that Bomba is qualified to testify as to his diagnosis and treatment of the Cunninghams.  In a sense, Plaintiffs are correct.  But they have too grand a notion of what diagnosis includes.  Plaintiffs argue that Bomba may testify that his *diagnosis* is that PCE contamination caused the illnesses.  (*See* Pls.' Br. 12 ("Here, Dr. Bomba, the treating physician, is offering expert testimony as to diagnoses of the Cunninghams' medical conditions now that he has access to additional facts regarding toxic environment in which they lived and worked.").)  On the contrary, this type of causation cannot be testified to based solely on Bomba's treatment of the Cunninghams.  *See Sutera v. The Perrier Group of Am., Inc.*, 986 F. Supp. 655, 667 (D. Mass 1997) ("[T]he ability to diagnose and to treat a disease is substantially different from the expertise required to assess its genesis to a reasonable degree of scientific

---

[6](...continued)
must provide a report pursuant to Federal Rule of Civil Procecure 26(a)(2)(B).  First, Bomba's testimony is of the retained expert variety; that is, he was paid to review documents and given his opinion.  Second, either way, his testimony must comply with Federal Rule of Evidence 702.

certainty.").  While one expects a treating physician to know facts about the treatment of a patient, Rule 702 requires that any opinion of any expert meet the requirements of reliability and relevance.

This is not to say that the right physician could not have testified to causation, had he demonstrated that he possessed the right qualifications and that his methodology was reliable.  But no physician may testify to his or her opinion based solely on the expert's say so and a medical degree.  Bomba may still testify as to his treatment of the Cunninghams, but he may not provide any testimony as to causation.  The motion as to Bomba's testimony and report will be **GRANTED**.

### D.     Qualifications

Defendants also argue that Houser and Bomba do not have the requisite "knowledge, skill, experience, training, or education" to give an opinion on whether or not PCE is the cause of Plaintiffs' illnesses.  Defendants argue that while Houser and Bomba have medical degrees, they have no qualifications in epidemiology or toxicology.[7]  Essentially, Defendants claim that Houser and Bomba cannot testify as to general causation given their lack of toxicology and epidemiology background.  Defendants are correct and this provides another basis for the outcomes explained above.

_____

[7]  Epidemiology is the "study of the distribution and determinants of disease"; toxicology is the "science of the nature and effects of poisons".  Fed. Judicial Ctr., Reference Manual on Scientific Evidence, 391, 436 (2d ed. 2000).

-20-

Houser and Bomba are medical doctors; however, that does not automatically give them the right to opine on all medically-related subjects in a court of law. *See Alexander v. Smith & Nephew, P.C.*, 98 F. Supp. 2d 1310, 1315 & n.2 (N.D. Okla 2000) (citing *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 24 (D. Mass. 1995) ("Just as a lawyer is not by general education and experience qualified to give an expert opinion on every subject of the law, so too a scientist or medical doctor is not presumed to have expert knowledge about every conceivable scientific principle or disease.")

In *Sutera v. The Perrier Group of America, Inc.*, 986 F. Supp. 655 (D. Mass 1997), the court excluded the opinion testimony of a physician that benzene caused the plaintiff's leukemia. The physician was an oncologist and hematologist, but did not have any experience with epidemiology or toxicology. *Id.* at 667. The court noted that there is a difference between what a doctor does on a daily basis and determining a general link between an external cause and a disease. *Id.* According to the court: "Simply having a medical degree or training is insufficient expertise to establish causation which hinges on factors such as 'dosage, duration of dosage and latency periods.'" *Id.* (quoting *Mason v. Texaco, Inc.*, 741 F. Supp. 1472, 1497 (D. Kan. 1990)). The court wrote further:

> Although he is a clinical physician . . . with considerable expertise diagnosing and treating leukemia, the ability to diagnose and to treat a disease is substantially different from the expertise required to assess its genesis to a reasonable degree of scientific certainty. . . .
>
> While Dr. Jacobson has reviewed the literature linking benzene to leukemia, his familiarity with it is quite limited.

*Id.*

-21-

Houser has experience diagnosing and treating asthma, but that does not make him qualified to "assess its genesis."  He has no professional experience or training in toxicology or epidemiology and has never treated a patient for exposure to PCE. (Houser Dep. 74.)  Although he—unlike Bomba—did some additional research to that provided by Plaintiffs, he had never researched the effects of long-term exposure to PCE prior to this case.  (*Id.* at 77.)

Bomba's qualifications are likewise insufficient.  It appears from his deposition that his only understanding of PCE and its affects came from information provided by the Plaintiffs.  (Bomba Dep. 34.)  Bomba, like Houser, has no professional experience or training in epidemiology or toxicology.  His answers in his deposition do nothing to counter the conclusion that Bomba lacks the qualifications to give an opinion on general causation.  When asked what a cohort study was, he responded, "I think I have a fairly good recollection of what a cohort study is."  (*Id.* at 29.)  When asked what toxicity was, he responded, "Something that hurts you.  Something that is dangerous.  Something that is harmful."  (*Id.*)

The *Reference Guide on Medical Testimony* states that medical doctors "may offer expert opinion on both specific and general causation."  Henifin et. al., *supra*, at 444.  However, it admits that testimony on specific causation is more common.  *Id.* Anyway, in this entry the court is not assuming that no physician can ever testify as to general causation; rather, it is assuming only that not every doctor by virtue of having a medical degree may testify as to general causation in every case.  The Seventh Circuit has confined expert testimony to the expert's field.  *See Jones v. Lincoln Elec.* Co., 188

F.3d 709, 723-24 (7th Cir. 1999) (affirming exclusion of opinion of metallurgist, although

he participated in epidemiological study, about effects of manganese on the body);

*Wintz*, 110 F.3d at 514 (affirming exclusion of toxicologist's opinion on specific causation

where the toxicologist was not a licensed physician).  The court finds that Houser and

Bomba lack the qualifications to testify as to general causation in this case.

**III.    Conclusion**

        For the reasons set forth above, the Defendants' motion in limine to exclude the

testimony and reports of Drs. Houser and Bomba are **GRANTED**.  The Doctors may not

testify as to causation but may testify as to any others matters that are allowed by the

Federal Rules of Evidence.

        ALL OF WHICH IS ENTERED this 19th day of April 2007.


                                        John Daniel Tinder, Judge
                                        United States District Court

Copies to:


Magistrate Judge William T. Lawrence

Jonathan P. Emenhiser
PLEWS SHADLEY RACHER & BRAUN
jemenhiser@psrb.com

Raymond L. Faust
NORRIS CHOPLIN & SCHROEDER LLP
rfaust@ncs-law.com

Bruce L. Kamplain
NORRIS CHOPLIN & SCHROEDER LLP
bkamplain@ncs-law.com

Peter M. Racher
PLEWS SHADLEY RACHER & BRAUN
pracher@psrb.com

Jana K. Strain
PRICE WAICUKAUSKI & RILEY
jstrain@price-law.com

Ronald J. Waicukauski
PRICE WAICUKAUSKI & RILEY
rwaicukauski@price-law.com